IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHERYL L. BEVERLY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05 C 6338 |
| ) | |
| PAUL L. KAUPAS, in his official capacity as ) | Judge Virginia M. Kendall |
| Sheriff of Will County, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cheryl L. Beverly ("Beverly") filed suit against Defendant, Paul L. Kaupas ("Kaupas" or "Sheriff's Office" or "Defendants") in his official capacity as Sheriff of Will County pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 2000(e) *et seq*., alleging that Lieutenant Ed Bradley ("Bradley"), an employee of the Will County Sheriff's Office ("Sheriff's Office"), created a hostile work environment and sexually harassed Beverly. Beverly alleges that Kaupas and other Sheriff's Office employees retaliated against her after she reported Bradley's sexual harassment. Kaupas moved for summary judgment on all of Beverly's claims. For the reasons set forth below, Kaupas's Motion for Summary Judgment is granted.

## STATEMENT OF FACTS

Beverly is a correctional officer employed by the Will County Sheriff's Office. Pltf. 56.1 Resp. at ¶ 2.[1] Bradley is a watch commander and was Beverly's supervisor from January 2000 to

---

[1] Citations to "Plaintiff's Response to Defendant's Local Rule 56.1(a)(3) Statement of Material Facts" have been abbreviated to "Pltf. 56.1 Resp." Citations to "Defendant's Response to Plaintiff's Statement of Additional Facts" have been abbreviated to "Def. 56.1 Resp."

November 4, 2004 when they both worked in the Will County Adult Detention Facility (the "ADF"). Pltf. 56.1 Resp. at ¶ 7. Since December 2002, Kaupas has been employed as the Will County Sheriff. Pltf. 56.1 Resp. at ¶ 3.

From January 2004 to June 21, 2004, Bradley made sexually promiscuous comments and suggestions to Beverly. Def. 56.1 Resp. at ¶ 1.[2] On many occasions, Bradley made comments to Beverly which included: "let me take care of you;" "put your battery operated toy away;" "I'll take care of you like a man;" and "let me clean your pipes out." Pltf. 56.1 Resp. at ¶ 8. On one occasion in March 2004, Bradley said to Beverly, "come over here, I want you to take your clothes off while I'm sitting with a drink watching you. Then I want you to sit on my lap." Pltf. 56.1 Resp. at ¶ 8. On at least twenty occasions, Bradley tried to run his hands through Beverly's hair. Pltf. 56.1 Resp. at ¶ 8. On at least five occasions, Bradley said to Beverly, "I'm doing you a favor by letting you work in a more favorable post," "say where you want to work," and "let me know where you want to work." Bradley also gave Beverly a note that read, "I'd like to bend you over." Pltf. 56.1 Resp. at ¶ 8. Beverly threw the note in the trash. *Id.* In April 2004, Bradley grabbed Beverly's hand, pulled her behind the desk where he was sitting, and grabbed her buttocks while simultaneously rubbing her hand in his crotch. *Id.*

As Bradley's unwelcome behavior toward Beverly increased in frequency, Beverly became more remonstrative. Def. 56.1 Resp. ¶ 10. On one occasion, for example, Beverly walked away from Bradley and Bradley told her, "You are starting to piss me off!" Beverly replied, "You are starting to piss me off too!" Def. 56.1 Resp. ¶ 11. During this same time period, Beverly also

---

[2] For purposes of this motion only, Kaupas does not dispute that Bradley sexually harassed Beverly from January 2004 to June 21, 2004. Def Mtn., p. 2; Pltf. 56.1 Resp. at ¶ 8; Def. 56.1 Resp. ¶ 1.

endured personal difficulties such as the death of her father and the illness of her mother and daughter. Def. 56.1 Resp. ¶ 3.

During the entire time of her employment with the Sheriff's Office the office had a written anti-harassment policy (the "Policy") which was in place since 1993. Pltf. 56.1 Resp. at ¶¶ 4, 5. The Policy provided procedures for making internal complaints about sexual harassment and for responding to such complaints. Pltf. 56.1 Resp. at ¶ 4. The parties dispute whether the highest ranking members of the office were required to attend yearly training, but agree that deputies, correctional officers, civilian personnel, supervisors, sergeants, and lieutenants, such as Bradley, were required to attend. Pltf. 56.1 Resp. at ¶ 5. Beverly attended the April 24, 2003 sexual harassment training seminar and reviewed the Policy and accordingly, Beverly understood the Policy and her options under the Policy if she were to become a victim of sexual harassment. Pltf. 56.1 Resp. at ¶ 6.

Between January and June 2004, Beverly complained to three Sheriff's Office employees about Bradley's sexually harassing behavior: Sergeant Gina Marotta ("Marotta"), Officer Chris Wilhelmi ("Wilhelmi") and Sergeant Brian Fink ("Fink"). Pltf. 56.1 Resp. at ¶ 22. When Beverly told Marotta, Beverly confided in her as a friend and asked her not to tell anyone about Bradley's behavior nor to "take the matter any further". Pltf. 56.1 Resp. at ¶ 23; Def. 56.1 Resp. at ¶ 17. Due to Beverly's adamant request, Marotta did not report Bradley's conduct. Pltf. 56.1 Resp. at ¶ 24. Although she did not report the matter officially, Marotta told Beverly to tell Bradley to stop the harassment. Pltf. 56.1 Resp. ¶ 25. If Bradley continued to harass Beverly, Marotta told her that shee should report back to Marotta and Marotta would need to do something about it. *Id*.

In June 2004, Beverly told Officer Wilhelmi about Bradley's sexually harassing behavior.

Pltf. 56.1 Resp. at ¶ 26.  Wilhelmi held the same rank as Beverly and did not supervise her.  Pltf. 56.1 Resp. at ¶ 27.  When Beverly spoke to Wilhelmi she did not believe that she was making an official report of sexual harassment and did not expect Wilhelmi to report the matter nor did she speak to him in the hopes that he would stop Bradley's harassing behavior.  Pltf. 56.1 Resp. at ¶ 26.  Although Wilhelmi was a union steward and offered to help Beverly by involving the union, Beverly chose not to involve the union.  Pltf. 56.1 Resp. at ¶ 28.

In June 2004, Beverly told Fink about Bradley's sexually harassing behavior.  Pltf. 56.1 Resp. at ¶ 29.  Like Marotta and Wilhelmi, Beverly confided in Fink as a friend and asked him not to report the matter because she believed that Bradley would soon be transferred out of the ADF.  Pltf. 56.1 Resp. at ¶ 29.  It was Fink's understanding also that Beverly did not want him to make a formal sexual harassment complaint.  Pltf. 56.1 Resp. at ¶ 30.  Nonetheless, Fink told Beverly that he had to report Bradley's conduct.  Pltf. 56.1 Resp. at ¶ 31.  Beverly became frustrated and told Fink that she had confided in him as a friend.  Pltf. 56.1 Resp. at ¶ 31.  Fink advised Beverly about her available remedies under the Policy and told Beverly that she had to make a decision about how she wanted to proceed and report back to him.  Pltf. 56.1 Resp. at ¶ 31.  After the meeting, Fink reviewed the Policy to ensure that he was acting correctly and concluded that he was not required to report the matter because Beverly refused to make a formal complaint.  Pltf. 56.1 Resp. at ¶ 32.

On June 21, 2004, Beverly told Warden O'Leary ("O'Leary") about Bradley's sexually harassing behavior.  O'Leary was the highest ranking officer at the ADF.  Pltf. 56.1 Resp. at ¶ 33.  Upon receiving Beverly's complaint, O'Leary told Deputy Chief David Van Dyke ("Van Dyke") to speak to Beverly and gather details about Bradley's harassment.  Pltf. 56.1 Resp. at ¶ 35.  In 2004, Van Dyke was in charge of security and operations at the ADF and was Bradley's supervisor.  Pltf.

56.1 Resp. at ¶ 35.  On the same day, Van Dyke called Beverly to schedule a meeting for the following day.  Pltf. 56.1 Resp. at ¶ 36.

On June 22, 2004, Van Dyke met with Beverly in his office and drafted a three-page memorandum to the Undersheriff detailing Bradley's harassment based upon his interview.  Pltf. 56.1 Resp. at ¶ 37.  Van Dyke forwarded the memorandum to the Undersheriff and recommended that the Internal Affairs Division of the Will County Sheriff's Office ("Internal Affairs") officially investigate Bradley.  Pltf. 56.1 Resp. at ¶ 39.  Following Van Dyke's recommendation, Undersheriff Martin Nowak ("Nowak") emailed Sergeant Steve McGrath ("McGrath"), an Internal Affairs investigator, and ordered him to investigate Bradley.  Pltf. 56.1 Resp. at ¶ 40.  Nowak also emailed Van Dyke ordering Van Dyke to have a senior level officer present when McGrath interviewed Bradley so that Bradley would understand that senior management was behind the investigation.  Pltf. 56.1 Resp. at ¶ 40.

On June 23, 2004, Van Dyke met with Bradley and ordered Bradley to have no contact with Beverly except as was necessary in the course of business.  Pltf. 56.1 Resp. at ¶ 41.  It was Van Dyke's belief that had Bradley violated his order, Bradley, at a minimum, would have been suspended.  Pltf. 56.1 Resp. at ¶ 41.  Van Dyke believed that ordering Bradley to have no contact with Beverly was sufficient to stop any further potential harassment because Bradley had never defied Van Dyke's orders during the ten-year period in which he was employed by the Sheriff's Office.  Pltf. 56.1 Resp. at ¶ 41.

Between June 22 and August 5, 2004, McGrath investigated Beverly's complaint.  Pltf. 56.1 Resp. at ¶ 42.  McGrath interviewed Fink, Marotta, and Wilhelmi and conducted a tape-recorded interview of Beverly and Bradley separately.  Pltf. 56.1 Resp. at ¶ 43.  At the end of Beverly's

internal affairs interview with McGrath, Beverly asked whether the Illinois State's Attorney's Office would pursue criminal charges against Bradley. Pltf. 56.1 Resp. at ¶ 89. McGrath responded: "You're fucked. The state's attorneys aren't going to touch this one." *Id*.[3] According to McGrath, there were no eyewitnesses to Bradley's harassing behavior toward Beverly. Pltf. 56.1 Resp. at ¶ 42. On August 5, 2004, McGrath sent his final report of the investigation to Kaupas. Pltf. 56.1 Resp. at ¶ 43. Having found, in McGrath's opinion, no evidence to corroborate Beverly's accusations, McGrath believed that the Sheriff's Office lacked the authority under the terms of the collective bargaining agreement to formally discipline Bradley. Accordingly, McGrath recommended to Kaupas that Bradley receive no formal punishment. Pltf. 56.1 Resp. at ¶ 44.

According to Bradley, once Beverly's allegations "got out" despite the requirement that they remain confidential, "general comments" were made "all the time all over the jail". Def. 56.1 Resp. at ¶ 34. "People laugh[ed] about it and [made] fun of it. You know, I hear it from people. I mean, that's the general atmosphere of the ADF." Bradley said that co-workers in the ADF "[laughed] about the lawsuit that is pending now." *Id*. When pressed to name exactly who was laughing and making comments, Bradley stated, "[t]he whole shift. Anybody. Everybody on the department. It is not a hidden fact." Def. 56.1 Resp. at ¶ 34.

From March 2004 to March 2005, Beverly alleges that Bradley persuaded the training division against scheduling her for Field Training Officer Assignments in retaliation for filing an official complaint against him. Beverly became a Field Training Officer ("FTO") in 2003. Pltf. 56.1 Resp. at ¶ 13. Field Training Officers train new recruits and receive compensation in addition to

---

[3] Beverly claimed at her deposition that McGrath's comment caused her to become very upset. Yet, Beverly did not identify McGrath's comment in her answers to Interrogatories as being retaliatory because she "didn't recall it" at the time and "probably forgot about it."

regular pay while they are doing so.  Beverly Dep., p. 86-87.  In 2004, Sergeant Roy Martin ("Martin") was the chief training officer and was responsible for scheduling field training for new recruits, including the FTO assignments.  Pltf. 56.1 Resp. at ¶ 14.[4]  Prior to June 2004, the training division scheduled Beverly for FTO training on a regular basis.  Def. 56.1 Resp. at ¶ 33; Beverly Dep., p. 245.  However, Beverly did not receive FTO assignments between March 2004 (a month and a half prior to Beverly's complaint to O'Leary) through March 2005 ( the month that Beverly transferred to court holding).  Pltf. 56.1 Resp. at ¶ 46.

Martin needed to rely on an officer's availably in order to schedule her for FTO assignments. He would not have scheduled officers for FTO assignments during any month in which they had significant absences.  Pltf. 56.1 Resp. at ¶¶ 13, 14, 16, 49.  Because the FTO schedule was prepared ten weeks in advance, Martin would not have scheduled a person for at least ten weeks after the absences concluded due this 10-week lead-time period.  Pltf. 56.1 Resp. at ¶¶ 14, 47.  Between February and May 2004, Beverly took 47 days off from work under the Family Medical Leave Act ("FMLA").  Pltf. 56.1 Resp. at ¶ 15.  In August, Beverly was absent 13 days due to sick and bereavement leave.  Pltf. 56.1 Resp. at ¶ 48.  Although Beverly's absences subsided after August 2004, Martin did not resume scheduling Beverly for FTO assignments because Beverly "fell off [his] radar".  Pltf. 56.1 Resp. at ¶ 50; Martin Affidavit, ¶¶ 7,9, 10.

---

[4]  Beverly denies that Sergeant Roy Martin made the FTO assignments citing pages 84-90 of her deposition testimony and pages 64-67 of Bradley's deposition testimony.  Pltf. 56.1 Resp. at ¶¶ 14, 47. Beverly's denial is not accompanied by specific references to admissible evidence in the record, and therefore, Kaupas's Motion to Strike Beverly's responses to Paragraphs 14 and 47 is granted.  *See Dent v. Bestfoods*, 2003 U.S. Dist. LEXIS 14871, 2003 WL 22025008, at *1 (N.D. Ill. 2003)(a denial is improper if the denial is not accompanied by specific references to admissible evidence or at least evidence that represents admissible evidence).  In fact, Beverly's deposition testimony supports the conclusion that the training department, and Martin specifically, was responsible for scheduling the training assignments.  Beverly Dep. p. 239.

Beverly did not tell anyone, including Martin and Van Dyke, that she wanted to be scheduled for FTO assignments. Pltf. 56.1 Resp. at ¶¶ 51, 52. Beverly concedes that FTO opportunities were unpredictable and sporadic and that she is not capable of calculating how much money she earned as a result of being scheduled for FTO assignments prior to March 2004. Pltf. 56.1 Resp. at ¶ 18. Beverly admits that she did not lose a significant amount of money as a result of not getting FTO assignments. [5] *Id.* Beverly's request to transfer to court holding was granted in March 2005 and FTO assignments are not available in court holding because recruits are trained at the ADF. Pltf. 56.1 Resp. at ¶ 46.

Beverly next asserts that Bradley retaliated against her in June 2004 by refusing to switch her vacation schedule and by refusing to allow her to take a "comp day." Beverly's vacation was scheduled for the second week of July and she wished to switch it to the first week of July. Pltf. 56.1 Resp. at ¶ 20. In June 2004, Beverly learned that a vacation slot for the first week of July became available because the employee who had originally scheduled it was on leave. Pltf. 56.1 Resp. at ¶

---

[5] Beverly believes that "it's possible" Bradley told Martin not to schedule her for new recruit training, but her assertions are not supported by the admissible evidence in the record. Beverly "[doesn't] know" whether she did not receive FTO assignments as a result of Bradley's harassing conduct or Bradley's retaliation against her but believes that "it's possible" because "it happened in the past with Julius Gambino," a co-worker. Pltf. 56.1 Resp. at ¶ 17; 50; Def. 56.1 Resp. at ¶¶ 32, 33; Beverly Dep. p. 239. Apparently, Gambino told Beverly that he angered Bradley and that Bradley told Martin not to let Gambino train new recruits. *Id.* Beverly's responses are stricken on the basis that they are not supported by admissible evidence. Namely, Beverly's assertions in Paragraphs 32 and 33 and responses to Paragraphs 17 and 50 are speculative, lack foundation, and are based upon inadmissible hearsay. *See Jankovich v. Exelon Corp.*, 2003 U.S. Dist. LEXIS 1466, 2003 WL 260714, at *5 (N.D. Ill. 2003)(evasive denials that do not directly oppose an assertion are improper and thus the contested fact are deemed to be admitted pursuant to Local Rule 56.1); *Dent v. Bestfoods*, 2003 U.S. Dist. LEXIS 14871, 2003 WL 22025008, at *1 (N.D. Ill. 2003)(a denial is improper if the denial is not accompanied by specific references to admissible evidence or at least evidence that represents admissible evidence). Martin denies that anyone, including Bradley, told him to stop assigning Beverly for field training assignments. Pltf. 56.1 Resp. at ¶ 50. Beverly admits that she does not have "evidence or facts" to prove that Bradley told the training department to use her after June 2004. Beverly Dep., p. 247. Additionally, Beverly failed to support her allegations that officers junior in seniority to her were assigned as Field Training Officers. Def. 56.1 Resp. ¶ 33.

19.  Bradley initially told Beverly that she could take the open slot.  However, after she complained to O'Leary regarding Bradley's conduct, Bradley gave the open slot to another employee.  Pltf. 56.1 Resp. at ¶ 19.  Beverly did not lose any vacation time as a result; but rather, was denied the opportunity to change her scheduled vacation time as she pleased, which she described as "not a big deal."  *Id*.  Although Beverly could have filed a union grievance regarding her requested vacation time, she did not.  *Id.*  During the same month, Beverly asked Bradley whether she could take a "comp day" and Bradley denied her request.  Pltf. 56.1 Resp. at ¶ 21.  Beverly did not lose her "comp time" as a result; but rather, was forced to use a personal day.  Pltf. 56.1 Resp. at ¶ 21.

Beverly further asserts that Bradley retaliated against her when he denied her request to change her scheduled days off from work.  Correctional officers are allowed two consecutive days off from work per week.  Pltf. 56.1 Resp. at ¶ 67.  Officers' days off from work are varied to ensure that there is a full staff on duty each day.  Pltf. 56.1 Resp. at ¶ 67.  It is highly unusual for supervisors at the ADF to grant an officer's request to change his or her days off from work because it necessarily requires adjusting other officers' schedules to ensure a full staff.  Pltf. 56.1 Resp. at ¶ 70.  As a result, a correctional officer who wishes  to change his or her scheduled days off from work must provide a reason to justify the change such as some kind of hardship.  Pltf. 56.1 Resp. at ¶ 71.  In July 2004, Beverly submitted a written request to Bradley asking to change her scheduled days off from work.  Pltf. 56.1 Resp. at ¶ 65.  Beverly requested the change because she wanted to avoid having those days fall on a scheduled holiday.  Pltf. 56.1 Resp. at ¶ 66.  Beverly concedes that absent a valid reason to change an officer's days off it is routine for supervisors to deny such requests and that scheduling days off to avoid having them fall on a holiday is not a valid reason.  Pltf. 56.1 Resp. at ¶ 71.  On July 6, 2004, Bradley denied Beverly's request to change her day's off from work.  Pltf. 56.1 Resp. at ¶

68. Again, although Beverly could have filed a union grievance regarding this issue, she did not. Pltf. 56.1 Resp. at ¶ 69.

Beverly believes that she received undesirable assignments from Bradley; namely, Bradley frequently assigned her to work with Larry Stein ("Stein") and Tressie Vance ("Vance") who "were always in trouble." Pltf. 56.1 Resp. at ¶¶ 57-58. Stein and Vance normally worked the midnight shift, but occasionally worked the day shift for overtime. Pltf. 56.1 Resp. at ¶ 59. The Daily Shift Rosters show the officers' assignments for the day. Pltf. 56.1 Resp. at ¶ 61. Watch commanders complete the forms each day on the date indicated. *Id.* Between June 21 and November 4, 2004 (when Bradley was transferred from the ADF), Beverly worked a total of 60 times and was assigned to work with either Stein or Vance a total of five times. Pltf. 56.1 Resp. at ¶ 62. On one of the five occasions in which Beverly was assigned to work with Stein and Vance, Bradley was not working and did not make the assignment. Pltf. 56.1 Resp. at ¶ 64. During the same time period, there were 21 correctional officers on the day shift on average at the ADF. Pltf. 56.1 Resp. at ¶ 63.

Finally, Beverly claims that after she reported Bradley's conduct, she became fearful of her safety and her daughter's safety. Def. 56.1 Resp. ¶ 25. On one occasion in 2004, Beverly saw Bradley driving eastbound on Route 6, a main road a few hundred yards from Beverly's home. Pltf. 56.1 Resp. at ¶ 85.[6] Beverly was stopped on her street in her car waiting to turn onto Route 6. *Id.* As he passed her, Beverly admits she did not see Bradley look at her nor does she know if he lives

_____

[6] In Beverly's Statement of Additional Facts she asserts that she became fearful of her safety because Bradley "drives past her house to intimidate her." Def. 56.1 Resp. ¶ 25; Beverly Dep., p. 325. However, Beverly actually testified that Bradley, on one occasion, drove on a main road a few hundred yards down the street from her home and that he didn't actually drive by her home. *Id.* Beverly's deposition testimony contradicts her affidavit wherein she attested that Bradley drove past her house in a squad car. Beverly Affidavit, ¶ 46.

in her area. Pltf. 56.1 Resp. at ¶ 85; Beverly Dep., p. 325. On another occasion in 2004, Beverly saw Bradley diving on Interstate 80 ("I-80"). Pltf. 56.1 Resp. at ¶ 86. Beverly was on the entrance ramp merging onto I-80 and Bradley was on I-80 approaching the point where the entrance ramp merges onto the Interstate. *Id*. As Beverly merged onto I-80, Bradley passed her. *Id*. Beverly has "no idea" whether Bradley was on I-80 for the purpose of intimidating her as opposed to traveling for an independent purpose. Beverly Dep, p. 337. But after seeing him, she was so emotionally distraught that she left work that day and went home. Pltf. 56.1 Resp. ¶ 88.

Beverly told Julius Gambino, a union representative, that Bradley was intimidating her and Gambino subsequently told Van Dyke. Pltf. 56.1 Resp. at ¶ 88. Van Dyke called Beverly confirming that Gambino had reported Bradley's conduct. *Id*. Beverly did not tell Van Dyke or O'Leary directly because she believed that they "probably wouldn't have done anything about it." Beverly Dep., p. 330-331.

Twice since 2004, Bradley entered and immediately left the ADF weight room while Beverly was in the weight room exercising. Pltf. 56.1 Resp. at ¶ 87. Bradley did not return to the weight room on either occasion, but rather, sent other guards into the weight room to ask Beverly whether she was almost finished. *Id.*

Beverly concedes that Bradley's sexually harassing behavior ceased as soon as she reported the conduct to O'Leary. Pltf. 56.1 Resp. at ¶ 34. After June 21, 2004, Bradley never made another inappropriate sexual comment to Beverly, never inappropriately touched her and never did anything that Beverly would construe as sexual harassment. Pltf. 56.1 Resp. at ¶ 34. On November 5, 2004, Bradley was transferred out of the ADF and has not worked with Beverly since that date. Pltf. 56.1 Resp. at ¶ 45. In March 2005, Beverly transferred from the ADF to court holdings in the Will County

Courthouse.  *Id*.  The ADF and the Courthouse are separate buildings.  *Id*.

<u>The ADF employees' conduct after Beverly's complaint to O'Leary</u>

On October 12, 2004, Beverly asked Van Dyke to transfer her to a location other than the ADF in order to get away from Bradley and to "escape the retaliation."  Pltf. 56.1 Resp. at ¶ 53.[7] There were only two possible transfers within Beverly's job classification: the Crete Temporary Detention Facility and court holding.  Pltf. 56.1 Resp. at ¶ 54.  The parties dispute whether Beverly waited unnecessarily for six months to transfer out of the ADF; Beverly claiming that a position was available in October 2004 and Van Dyke claiming that he transferred Beverly the minute a position became available.  Pltf. 56.1 Resp. at ¶¶ 54, 55; Def. 56.1 Resp. ¶ 28.  Although she could have, Beverly chose not to file a union grievance concerning Van Dyke's delay.  Pltf. 56.1 Resp. at ¶ 56. Bradley transferred out of the ADF less than three weeks after Beverly asked Van Dyke to transfer her to court holding.  Pltf. 56.1 Resp. ¶¶ 45, 56.

After Beverly's transfer to court holding, she worked the 8:30 a.m. to 4:30 p.m. shift.  Pltf. 56.1 Resp. at ¶ 72.  In July or August, 2006, Beverly desired to switch shifts with another co-worker so that she could work the 8:00 a.m. to 4:00 p.m. shift.  Beverly asked to "bump" co-worker Mike Dinovo ("Dinovo"), a junior co-worker.  Pltf. 56.1 Resp. at ¶ 72.  For ADF positions, senior

---

[7]  Kaupas objects to Paragraph 27 on the basis that Beverly's affidavit contradicts her deposition testimony in which she stated that she transferred to get away from Bradley.  However, Beverly was not asked if this was the only reason that she transferred and Beverly's affidavit states that she also transferred to escape her co-worker's retaliatory conduct.  Kaupas is correct that Beverly can not contradict her deposition testimony through a subsequent affidavit, *see Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir. 2001), but here, Beverly's affidavit is supplementary rather than contradictory and this Court can consider Beverly's attestation regarding her transfer.

employees can "bump" junior employees once a year during "shift picks." Pltf. 56.1 Resp. at ¶ 73.[8] Initially, Dinovo agreed to switch shifts but changed his mind after Van Dyke told him that he wasn't obligated to do so under the terms of the CBA. Pltf. 56.1 Resp. at ¶¶ 74-75. Shift picks and bumping are not available for court holding positions, and therefore, Beverly's switch shift request was rejected. Pltf. 56.1 Resp. at ¶ 76.

In 2004, Beverly's daughter was being treated by a rheumatologist on the University of Illinois faculty. Def. 56.1 Resp. ¶ 23. Her daughter's doctor only saw new patients on Tuesdays and follow-up patients on Fridays between the hours of 11 a.m. to 4:00 p.m. *Id.* By November 1, 2006, Beverly had taken 13.5 sick days and twelve of the 13.5 sick days occurred immediately before or after Beverly's scheduled days off from work. Pltf. 56.1 Resp. at ¶ 82. Sick time abuse occurs when an employee take more than his or her accrued sick time, or when an employee develops a practice of taking sick days immediately before or after scheduled days off. Pltf. 56.1 Resp. at ¶ 83.

In November 2006, Lieutenant Egan put Beverly on notice for abusing sick time. Pltf. 56.1 Resp. at ¶ 78. For the next six months Beverly was required to submit proof of illness whenever she

_____

[8] Beverly contends that Chief Van Dyke erroneously advised Dinovo that the Collective Bargaining Agreement ("CBA") did not require a shift switch but cites to the Deputy Sheriff's CBA and not the applicable Correctional Officer CBA. Pltf. 56.1 Resp. at ¶ 74; Kaupas Reply, p. 4. Beverly admitted during her deposition that Deputy Sheriffs had their own union contract and admitted that she has no evidence that Van Dyke persuaded Dinovo to "change his mind" regarding the shift in retaliation for her complaints as opposed to correctly advising Dinovo that he was not obligated to change shifts with Beverly under the Correctional Officer CBA. Beverly dep., pp. 16-26; Pltf. 56.1 Resp. at ¶ 75; Kaupas Reply, p. 4. However, Beverly's speculation, hunches, and intuitions are not enough to rebut Defendant's factual assertions. *See Rand v. CF Industries, Ind.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (Inferences must be ground upon more than speculation, hunches, intuitions, or rumors, otherwise there would be no summary judgment in discrimination cases.). Accordingly, Beverly failed to adequately rebut Kaupas's assertion with citations to specific support in the record, and therefore, those assertions are deemed admitted. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.); *see also* Beverly's Response to Defendant's Statement of Facts ¶¶ 74-77.

took sick leave.  Pltf. 56.1 Resp. at ¶ 79.  Beverly did not consider being put on notice for abusing sick time a "big deal" because she was already bringing doctor's notes to work whenever she took sick days.  Pltf. 56.1 Resp. at ¶ 80.  Other than comparing herself to two other employees whom Beverly believes had taken a lot of sick time[9], Beverly has no evidence or facts to show that Lieutenant Egan was motivated by a desire to retaliate against Beverly for filing a sexual harassment lawsuit.  Pltf. 56.1 Resp. at ¶ 81.

It is Beverly's position that instead of receiving protection, understanding, and support from her co-workers and supervisors, she received a cold shoulder and unjust criticism.  Def. Resp. 56.1 ¶ 18; Beverly Aff. ¶ 31. Sometime after Beverly's complaints to O'Leary and Van Dyke, co-workers Bradley favored, such as LaTasha Chandler ("Chandler") and Vicky Ward ("Ward"), laughed and made jokes about Beverly's allegations, called Beverly "a rat," and completely stopped talking to her. Def. Resp. 56.1 ¶ 18; Beverly Aff. ¶ 31.  Similarly, co-workers told Beverly that Beverly "better be careful what she said" or other co-workers "better be careful what they said and did around [her]". *Id.*  Supervisors who once were friendly to Beverly, such as Sergeants Marotta and Fink, barely spoke to Beverly after she complained about Bradley.  Def. Resp. 56.1 ¶ 20.  Beverly told Van Dyke about her co-workers' behavior and Van Dyke shared Beverly's complaints with Warden O'Leary.  Def. Resp. 56.1 ¶ 18; Van Dyke Dep., pp. 114-117.

Although she could have requested a transfer back to the ADF, Beverly was happy with her court holding assignment and voluntarily chose to remain there despite the fact that she would have

---

[9]  Beverly contends that some of her coworkers took far more sick time than she and were placed on sick leave.  However, her testimony is based upon inadmissable hearsay and thus will not be considered in her effort's oppose summary judgment.  Def. 56.1 Resp. ¶ 24; *see Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

FTO opportunities at the ADF. Pltf. 56.1 Resp. at ¶ 93. Nevertheless, Beverly asserts that the court holding assignment is a "dead-end" job because there is little chance for advancement. Def. 56.1 Resp. at ¶ 29. Although Beverly also believes that she could be a sergeant by now, she has chosen not to take the exam. Pltf. 56.1 Resp. at ¶ 94. Beverly states hat she has no desire to take the necessary steps to advance her career at the Sheriff's Office due to Bradley's sexual harassment and retaliation. Pltf. 56.1 Resp. at ¶ 92.

Beverly concedes that between January 2004 and June 21, 2004, she was never demoted, fired, disciplined, or suspended from her job. Pltf. 56.1 Resp. at ¶ 9. Beverly did not receive a negative performance review at the end of 2004. Pltf. 56.1 Resp. at ¶ 10. Indeed, Beverly's official performance review was positive and she agreed with the accuracy of the review. *Id.* Beverly was never denied overtime nor was her rate of pay reduced. Pltf. 56.1 Resp. at ¶ 11. Other than not receiving FTO opportunities after March 2004, Beverly did not lose any job responsibilities between January 2004 and June 21, 2004. Pltf. 56.1 Resp. at ¶ 12.

Bradley's behavior toward other women employed by the Sheriff's Office

Although they do not specify dates and times, Janette Shiparek ("Shiparek") and Lisa Tishy ("Tishy") complained to authorities in the Sheriff's Office regarding Bradley's sexually harassing behavior toward them. Def. 56.1 Resp. at ¶ 36. Shiparek attested that Bradley engaged in inappropriate and unwelcome conversations with her making her so uncomfortable that she asked her co-workers not to leave her alone with him. Def. 56.1 ¶ 44; Shiparek Affidavit. Shiparek told Marotta that Bradley made her uncomfortable. Def. 56.1 Resp. ¶ 44.

Marotta also told Beverly that on one occasion, Bradley tried to rub her neck and that she responded by elbowing him. Def. 56.1 Resp. ¶ 45; Marotta Dep. pp. 46-48. However, Marotta was

not angry with Bradley over the incident. Marotta Dep., p. 89.

Bradley also asked fellow Sheriff's Office employee Julie Sterr out for a date on several occasions and "alluded" to having sex with her on more than one occasion. Sterr became "annoyed" and told Bradley to "Fuck off and leave me alone". Def. 56.1 Resp. at ¶ 45; Sterr Dep. pp. 38-41.

On April 19, 2005, another correctional officer, Megan Paulsen Peyton ("Peyton"), complained to Deputy Chief Patrick Maher ("Maher") that Bradley was verbally harassing her in the workplace. Def. 56.1 Resp. at ¶ 47; Exhibit A. Maher documented Peyton's complaint in a memorandum to Lieutenant Thomas Carey and Undersheriff Nowak. *Id.*

Bradley has never been disciplined for sexual harassment. Def. 56.1 Resp. at ¶ 38. The Sheriff's Office maintains that they did not find sufficient evidence to establish that Bradley violated the policy with respect to Beverly or any other complainant. Def. 56.1 Resp. ¶ 38.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed

statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

I.  Kaupas's Motion for Summary Judgment

For purposes of this motion, Kaupas concedes that Bradley sexually harassed Beverly from January 2004 to June 21, 2004. Kaupas Mtn., pp. 1-2. Therefore, the basis of Kaupas's Motion for Summary Judgment as to Beverly's hostile environment claim is limited to the *Ellerth/Faragher* affirmative defense. Kaupas further argues that none of Beverly's alleged instances of retaliation were materially adverse or motivated by Beverly's opposition to Bradley's harassment. *Id.*

II.  The *Ellerth/Faragher* Affirmative Defense

When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability. *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998). One such affirmative defense was set out in the companion cases of *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In *Ellerth*, the Court stated:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or

successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise . . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment.

524 U.S. at 765. Thus, in order for the *Faragher/Ellerth* defense to be available to an employer, the employer must not have taken a tangible employment action against the employee. *McPherson v. City of Waukegan*, 379 F.3d 430, 439-40 (7th Cir. 2004).

A.    Whether Beverly suffered an intangible employment decision

A tangible employment action must cause a substantial detriment to the plaintiff's employment relationship. *Savino v. C.P. Hall Co.*, 199 F.3d 925, 932 (7th Cir. 1999). As the Supreme Court stated: "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 766 (emphasis added). Beverly was never demoted, fired, suspended, or disciplined, nor was her pay reduced. Pltf. 56.1 Resp. ¶¶ 9-11. Beverly's job title and salary remained the same. *Id*. at ¶¶ 12. In fact, Beverly received a positive performance evaluation at the end of 2004. *Id*. There is no genuine issue of material fact that Bradley's harassment resulted in a tangible employment decision. See Pltf. 56.1 Resp. ¶¶ 9-21. Indeed, Beverly does not argue in her Response that Bradley's harassment resulted in a tangible employment decision, but rather, constrains her arguments to the other two components of the affirmative defense. *See* Beverly Response. Accordingly, Beverly did

not suffer a tangible employment action and Kaupas is entitled to raise the *Faragher/Ellerth* affirmative defense. *McPherson*, 379 F.3d at 439-40.

      B)    <u>Whether Kaupas exercised reasonable care to prevent and promptly correct Bradley's sexually harassing behavior</u>.

      The first element of the *Ellerth/Faragher* affirmative defense requires Kaupas to show that the Sheriff's Office exercised reasonable care to prevent and correct Bradley's sexually harassing behavior. Here, Beverly does not dispute that the Sheriff's Office had a written anti-harassment policy in place during Beverly's employment and that deputies, correctional officers, civilian personnel, supervisors, sergeants and lieutenants must attend yearly training. Pltf. 56.1 Resp. at ¶¶ 4-5. Beverly does not argue that the Sheriff's Office failed to take measures to prevent sexual harassment in the workplace, but rather, challenges the Sheriff's Office's response to Beverly's sexual harassment claims. Beverly Resp. p. 5. Accordingly, there is no question of material fact concerning the measures taken by the Sheriff's Office to prevent Bradley's harassment nor is there any issue that those measures were reasonable. *See Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007) (Employers exercise reasonable care by having anti-harassment policy and by disseminating that policy to its workforce).

      When considering whether the Sheriff's Office's response was reasonably calculated to prevent further harassment, the court looks to the Sheriff's knowledge at the time it implemented the corrective measure. *Savino*, 199 F.3d at 933. Beverly concedes that Bradley's sexually harassing behavior ceased as soon as she reported the conduct to O'Leary. Pltf. 56.1 Resp. at ¶ 34.[10] Yet,

_____

    [10] The Sheriff's Office acted reasonably to correct Bradley's harassing behavior toward Beverly *prior* to June 21, 2004 in light of the undisputed evidence that Beverly chose not to file a formal complaint and persuaded Marotta, Fink, and Wilhelmi against taking any action on her behalf. *See Jackson,* 474 F.3d

Beverly argues that the Sheriff's Office's response to Beverly's complaints of Bradley's sexual harassment were not reasonably likely to prevent the harassment from recurring because "Bradley has a long history of sexually harassing females with whom he comes into contact in the workplace, both before and after Beverly filed her complaint". *See* Def. 56.1 Resp. ¶ 43.

Even if this Court were to assume that the Sheriff's Office was somehow aware of Bradley's behavior toward other women prior to Beverly's complaints, Courts have rejected the notion that an employer is subject to what amounts to strict liability for every second incident of harassment committed by an employee. *See Longstreet v. Ill. Dep't. of Corr.*, 276 F.3d 379, 382 (7th Cir. 2002); *see also McKenzie v. Potter*, 2006 U.S. Dist. LEXIS 19765, * 24-27 (N.D. Ill. 2006) (Court rejected plaintiff's argument that the employer had a further duty to continue investigation and prevent her eventual harassment despite prior harassing behavior toward other women by the plaintiff's supervisor). In *Longstreet*, the Plaintiff argued that the Department of Correction's failure to adequately punish her supervisor for prior harassing conduct toward other women was negligence. 276 F.3d at 382. Although she asserted that the supervisor's harassment toward her could have been prevented had the DOC taken reasonable steps in connection with prior harassing conduct toward the other women, she proffered no evidence that any of the prior incidents involving other women were reported to a supervisor. *Id.* Significantly, once the Plaintiff formally complained about her supervisor's conduct, the harassment ceased. *Id.* The Court rejected Plaintiff's arguments and reasoned that "[i]t would push the role of deterrence too far to say that a response which seemed to

at 501-502; (Defendants can not be criticized for attempting to work with complainants who did not wish to lodge formal complaints at least over the short time between February 2001 and May 2001 when the committee launched its investigation). It is further undisputed that Bradley's harassing behavior stopped immediately after Beverly formally complained to O'Leary.

be within the realm of reasonableness in one situation can, if ultimately it did not have the proper deterrent effect, be the sole basis for liability in another case even if the employer's response in the second case was clearly sufficient." *Id.* Similarly, Beverly failed to proffer evidence that other female employees reported Bradley's conduct to their supervisors and once Beverly formally complained about her supervisor's harassment, the harassment ceased.

Significantly, the evidence does not support a finding that other women complained to the Sheriff's Office about Bradley's sexually harassing behavior *prior* to Beverly's June 21, 2004 complaint. Def. 56.1 Resp. ¶ 43. For example, both Shiparek and Tishy's affidavits fail to identify conduct by Bradley prior to that date; in fact, no time frame is set forth. Tishy denies reporting the matter and Shiparek fails to attest that she reported it. *Id.*; *citing* Tishy Aff., Tab 16; Shiparek Aff., Tab 12. Shiparek told Marotta at a bar that Bradley made her "uncomfortable" but did not elaborate further. Marotta Dep., p. 57-62; Def. 56.1 Resp. ¶ 44. Marotta does not remember when that conversation took place nor does Marotta know if Shiparek filed a formal complaint. *Id.* Peyton filed a formal complaint long after Beverly's complaint to O'Leary and Marliss O'Leary's complaints concerned other male employees. Def. 56.1 Resp. ¶ 47; O'Leary Aff., Tab 15. Moreover, Sterr found Bradley's comments to be "annoying" but did not report his behavior to other members of the Sheriff's Office. Sterr Dep., p. 38-30. Accordingly, Beverly failed to present any evidence that other women formally complained about Bradley's sexually harassing behavior *prior* to Beverly's June 21, 2004 complaint to O'Leary. Def. 56.1 Resp. ¶ 4.

As for how the Sheriff's Office's responded to Beverly's June 21, 2004 complaint, the employer's response to complaints of harassment is adequate if it is reasonably calculated to end the harassment under the particular facts and circumstances of the case at the time the allegations are

made. *Longstreet*, 276 F.3d at 382; *citing Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989); *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473 (7th Cir. 1996). What a reasonable response depends on the gravity of the harassment. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995). An employer must take more care to protect employees, depending on the seriousness of the harassment. *See Ellison v. Brady*, 924 F.2d 872 (9th Cir. 1991). Beverly argues that McGrath's investigation was inadequate and against the Sheriff's anti-harassment policy's procedure. However, as the Sheriff's Offices points out, O'Leary and Van Dyke took immediate– and ultimately successful– corrective action. It is undisputed that upon receiving Beverly's complaint, O'Leary told Van Dyke, Bradley's supervisor, to speak to Beverly and gather details about Bradley's harassment. The next day, Van Dyke met with Beverly, drafted a three-page memorandum to the Undersheriff detailing Bradley's harassment, and recommended that Internal Affairs officially investigate Bradley. Following Van Dyke's recommendation, Undersheriff Nowak emailed McGrath, an Internal Affairs investigator, and ordered him to investigate Bradley. Nowak also emailed Van Dyke ordering Van Dyke to have a senior level officer present when McGrath interviewed Bradley so that Bradley would understand that senior management was behind the investigation. On June 23, 2004, Van Dyke met with Bradley and ordered Bradley to have no contact with Beverly except as was necessary in the course of business. Had Bradley violated Van Dyke's order, Bradley would have been suspended or worse. Van Dyke's warning was successful because Beverly was not subjected to further harassment by Bradley.

Beverly argues that McGrath's investigation was biased because his investigation was limited to interviewing five people and failed to include interviewing other individuals who may have worked with Beverly and Bradley. Beverly Resp., p. 5. However, Beverly failed to put forth

evidence that there were witnesses to Bradley's conduct toward Beverly or that interviewing additional witnesses would have corroborated Beverly's allegations against Bradley. Instead, the evidence is that the Sheriff's Office conducted a prompt investigation of the matter and successfully deterred Bradley's harassing conduct toward Beverly. *See Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 953-54 (7th Cir. 2005) ("Our cases recognize prompt investigation of the alleged misconduct as a hallmark of reasonable corrective action."); *citing Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 428 (7th Cir. 2004) (finding employer's actions reasonable when, the day after it was alerted to a highly offensive caricature of the plaintiff, it "began a complete investigation," including interviewing employees in the plaintiff's department and "retaining a forensics expert to analyze the handwriting on the caricature to determine who made it"); *Savino*, 199 F.3d at 933; (finding that the employer "reasonably attempted to correct and prevent sexual harassment" when it "promptly investigated [the employee's] charges and sought to remedy the problem"); *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 535 (7th Cir. 1993) (emphasizing that the employer "began an investigation the day after it was advised of Saxton's complaint"). Additionally, a review of the Policy indicates that the Sheriff's Office followed the Policy almost to the letter. Pltf. 56.1 Resp. Tab 21; WCSO 0086.

Regarding Bradley's conduct toward other women after Beverly's complaint to O'Leary, Title VII does not require that the employer's responses to a plaintiff's complaints of supervisory sexual harassment successfully prevent subsequent harassment, only that the employer's actions were reasonably likely to check future harassment. *Savino*, 199 F.3d at 933; *citing Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1036 (7th Cir. 1998); *see Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999); *citing Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) ("An employer need not prove success in preventing harassing behavior in order to

demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct."). Moreover, Beverly's argument that Bradley's subsequent harassment of other women conferred a duty upon Kaupas to re-open her investigation despite the undisputed fact that the Sheriff's Office's response to Beverly's complaints deterred Bradley's future conduct toward her is unpersuasive and unsupported.

Although Beverly bemoans McGrath's investigation and the level of discipline imposed on Bradley, the Sheriff's Office's response was reasonably likely to prevent future harassment, particularly as it did so. *See Gawley v. Indiana Univ.*, 276 F.3d 301, 311-312 (7th Cir. 2001) (affirming dismissal where plaintiff acknowledged that the investigation undertaken and resulting sanction brought an end to harassment). The Sheriff's Office was not required to take all the actions Beverly would have preferred, such as demoting or firing Bradley. *See Dominicak-Brutus v. Urban Prop. Servs. Co.*, 217 F. Supp. 2d 911, 917 (N.D. Ill. 2002); *Carl v. Parmely*, 188 F. Supp. 2d 991, 1006 (S.D. Ill. 2001) (employer need not "remove a harassing supervisor from his position . . . if other reasonable measures are taken"); *See Williams v. Waste Mgmt. of Illinois, Inc*., 361 F.3d 1021, 1030-1031 (7th Cir. 2004)(affirming summary judgment where employer's process was imperfect, but not negligent); *Wyninger v. New Venture Gear, Inc*., 361 F.3d 965, 978 (7th Cir. 2004). Beverly's argument that the Sheriff's Office could have done more is irrelevant unless she can present some evidence suggesting that the steps that it actually took were not reasonably likely to prevent the harassment from recurring. *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 813 (7th Cir. 2001). Therefore, the Sheriff's Office met its burden with respect to the first element of the affirmative defense.

      C) <u>Whether Beverly unreasonably failed to take advantage of any preventive or</u>

corrective opportunities provided by the Sheriff's Office or to avoid harm otherwise.

The second element in *Ellerth/Faragher* affirmative defense requires Kaupas to prove that Beverly unreasonably failed to take advantage of any preventative or corrective opportunities provided by the Sheriff's Office or to avoid harm otherwise. A plaintiff's unreasonable delay in reporting alleged harassment constitutes failure to take advantage of corrective measures and may preclude her recovery. *See Gawley*, 276 F.3d at 312 (employer established second element where plaintiff neglected to complain about comments for seven months); *Savino*, 199 F.3d at 933; (where plaintiff waited four months to report harassment); *see also Jackson*, 474 F.3d at 501; (four-month delay). "The purpose of this requirement is tied to Title VII's primary objective, which is not meant to provide redress but rather to avoid harm." *Gawley*, 276 F.3d at 312.

The Policy provides procedures for making internal complaints about sexual harassment and for responding to such complaints. Pltf. 56.1 Resp. at ¶ 4. Beverly attended the April 24, 2003 sexual harassment training seminar and reviewed the Policy. Pltf. 56.1 Resp. at ¶ 6. Accordingly, Beverly understood the Policy and her options under the Policy if she were to become a victim of sexual harassment. Pltf. 56.1 Resp. at ¶ 6. The Policy provides that victims of sexual harassment should "immediately" come forward and report or complain of such prohibited conduct. According to the Policy, the victim may bypass confronting the offender, and proceed directly to the Undersheriff or the Administration Division or directly to the Sheriff. Nevertheless, Beverly admits that she did not file a formal complaint against Bradley until June 21, 2004 even though Bradley began harassing her on or about January 2004. Beverly claims that the over six-month delay is justified because Beverly tried to handle the matter herself, because she confided in Marotta and Fink, and because she was suffering from personal problems at the time. Beverly Resp., p. 9.

Like the Plaintiff in *Gawley*, Beverly's failure to complain during six months of what she describes as escalating harassment that occurred on an "almost daily basis," in combination with the insufficiency of her repeated informal efforts to stop Bradley's behavior constitute an unreasonable failure to take advantage of the Sheriff's Office's corrective procedures. *See Gawley*, 276 F.3d at 312 ("[Plaintiff's] neglect of the university's formal procedures during seven months of escalating harassment, in combination with the insufficiency of her repeated informal efforts to stop [her harasser] constitute an unreasonable failure to take advantage of the university's corrective procedures."). As soon as Beverly used the formal procedures, which did not require her to complain to the harasser but provided an alternate channel for her complaint, the Sheriff's Office took action and the harassment stopped. Although Beverly tried to weather the storm and convince Bradley to stop harassing her and vented to supervisors while persuading them against responsive action, these decisions ultimately denied the Sheriff's Office an opportunity to remedy the situation for six months. Moreover, Beverly's arguments that her reports to Fink and Marotta justified her delay are not persuasive in light of Beverly's undisputed testimony that she asked both Marotta and Fink not to tell anyone else about Bradley's behavior. *See Jackson,* 474 F.3d at 501-502; (Defendants cannot be criticized for attempting to work with complainants who did not wish to lodge formal complaints at least over the short time between February 2001 and May 2001 when the committee launched its investigation). It wasn't until Fink told Beverly that Fink had to report Bradley's conduct and that Beverly had to make a decision that Beverly lodged a formal complaint to O'Leary.

The Sheriff's Office has demonstrated that there is no genuine issue of material fact and that, as a matter of law, it is entitled to the *Ellerth/Faragher* affirmative defense. Accordingly, the Sheriff's Office's Motion for Summary Judgment is granted.

III.     Beverly's Retaliation Claim

Beverly has also brought a Title VII claim for retaliation alleging that she was fired because she complained about sexual harassment. Beverly has elected to proceed under the indirect method. Beverly Resp., p. 10. To succeed under the indirect method of proof on a retaliation claim, a plaintiff must demonstrate: "(1) that she engaged in protected activity; (2) that she was subjected to an adverse employment action; (3) that she was performing her job satisfactorily; and (4) that no similarly situated employee who did not engage in protected activity suffered an adverse employment action." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 788 (7th Cir. 2007); *quoting Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its employment action. If the employer meets its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is pretextual. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). Here, the parties do not dispute that Beverly was engaged in protected activity when she complained to O'Leary regarding Bradley's conduct nor do they dispute that she was performing her job satisfactorily. The crux of the Kaupas's Motion for Summary Judgment is that Beverly was not subject to an adverse employment action.

Beverly concedes that between January and June 21, 2004, she was never demoted, fired, disciplined, or suspended from her job in retaliation for her complaints to O'Leary about Bradley. She further concedes that her pay remained the same, her performance review for 2004 was positive, and that other than FTO assignments, she did not lose any job responsibilities or benefits. Instead, Beverly points to seven examples of retaliatory conduct for opposing Bradley's harassment: Bradley's denial of Beverly's requests to change her days off from work, hours, scheduled vacation

days, and "comp" time; Van Dyke's denial of Beverly's transfer requests; Egan's sick-time abuse

notice; Bradley's undesirable partner assignments; Bradley's retaliatory intimidation; Beverly's co-

workers' ridicule; and Martin's failure to schedule Beverly for FTO assignments from March 2004

to March 2005.

Not everything that makes an employee unhappy is an actionable adverse action. *Bell v.*

*E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000). An adverse employment action must be materially

adverse, not merely an inconvenience or a change in job responsibilities, and must significantly alter

the terms and conditions of the employee's job. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004);

*citing Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002); *Stutler v. Ill. Dep't of Corr.*,

263 F.3d 698, 703 (7th Cir. 2001). Beverly's grievances associated with Bradley's denial of her

request to change her days off from work, shift hours, scheduled vacation days, and comp time

simply do not suffice. *Griffin*, 356 F.3d at 829 (denial of shift changes is not an adverse employment

action); *Grube v. Lau Industries, Inc*., 257 F.3d 723, 729-30 (7th Cir. 2001)(a transfer to the second

shift was not an adverse employment action); *Campbell v. Henderson*, 2002 U.S. Dist. LEXIS 13849

(N.D. Ill. 2002) (three denials of vacation requests is not an adverse employment action); *Rhodes v.*

*Illinois Dept. Of Transpo*., 359 F.3d 498, 505 (7th Cir. 2004) (denial of personal days is not an

adverse employment action). The scheduling of an employee's work hours, shifts, vacation and comp

time is a determination made in the ordinary course of business by an employer as part of its daily

operations, and the Seventh Circuit has made it clear that Title VII does not authorize courts to act

as a "'super-personnel department' intervening whenever an employee feels he is being treated

unjustly." *Cardoso v. Robert Bosch Corp*., 427 F.3d 429, 435 (7th Cir. 2005); *see also Wells v.*

*Unisource Worldwide, Inc*., 289 F.3d 1001, 1007 (7th Cir. 2002)("courts do not sit as super personnel

departments to second guess an employer's facially legitimate business decisions").

Additionally, there is no genuine issue of material fact that Bradley's denials of Beverly's requests to change her days off, work hours, vacation days, and comp time did not significantly alter the terms and conditions of her job. Beverly admits that she did not lose any vacation time, but rather, Beverly was denied the opportunity to change her scheduled vacation time as she pleased from one week in July to the next. Beverly testified that losing the opportunity to change the week of her scheduled vacation was "not a big deal." Similarly, Beverly did not lose her "comp time" as a result of Bradley's denial, but rather, was forced to use a personal day. Regarding Bradley's denials of Beverly's request to change her days off from work, Beverly admits that it was incumbent upon her to put forth a reason to justify the change such as some kind of hardship. Yet, Beverly requested the change because she wanted to avoid having her days off fall on a scheduled holiday. Beverly concedes that an officer's desire to have his or her days off fall on a holiday later in the year is not a valid reason to grant a request to change days off. Accordingly, the evidence shoes that Bradley's denial of Beverly's requests to change her days off, work hours, vacation days, and comp time was merely inconvenient for her and did not significantly alter the conditions of her employment.

Even assuming for argument's sake that Beverly's grievances constitute adverse employment decisions, Beverly failed to put forth evidence that similarly situated employees who did not engage in protected activity made similar requests and that those requests were granted. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (noting that, in order to demonstrate that a comparison individual is similarly situated to a plaintiff, the plaintiff is required to produce evidence that the comparison employee is "directly comparable to her in all material respects," and further noting that "experience, education and qualifications" are particularly relevant in this inquiry).

Regarding Beverly's request for a transfer, Beverly does not claim that Van Dyke denied her transfer request or that Van Dyke forced Beverly to transfer to court holding. Rather, Beverly argues that Van Dyke retaliated against her by delaying the transfer for six months despite Beverly's request to "escape the retaliation" of her coworkers. The Seventh Circuit has considered whether a delay in transfer was sufficiently adverse. *See Haywood v. Lucent Technologies*. 323 F.3d 524 (7th Cir. 2003); *see also Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). In *Haywood*, the Court reasoned that "mere unhappiness and inconvenience are not actionable under Title VII" and that "[a]t minimum, the employee must be able to show a quantitative or qualitative change in the terms or conditions of employment." *Id.* at 532; *citing Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 753 (7th Cir. 2002). The Court concluded that the alleged one-month delay in Plaintiff's transfer was not adverse because the Plaintiff's duties, responsibilities, compensation and benefits remained the same during this period, and that Haywood did not allege that the delay affected her opportunities or otherwise injured her career. *Id.*; *citing Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 744 (7th Cir. 2002). Here, there is no evidence that Beverly's duties, responsibilities, compensation, and benefits changed during the six-month delay nor does Beverly proffer evidence that the delay affected her opportunities or injured her career. Accordingly, like the plaintiff in *Haywood*, "[t]he uncertainty [Beverly] experienced while waiting for her transfer may have been unpleasant, but it was not severe enough to constitute an adverse employment action." *Id.* Finally, Bradley was transferred out of the ADF less than three weeks after Beverly requested the transfer and during that three-week period, Bradley did not harass her or have contact with her.

Moreover, Beverly failed to proffer evidence that similarly situated individuals who requested

similar transfers and did not engage in protected activity were transferred in less than six months and before an available position became open. *See Patterson*, 281 F.3d and 680. Even assuming Beverly fulfilled her *prima facie* case on this point, Beverly was unable to rebut sufficiently Van Dyke's non-discriminatory evidence that there were only two possible transfers within Beverly's job classification and that he transferred Beverly the minute a position became available. Pltf. 56.1 Resp. at ¶¶ 54, 55; Def. 56.1 Resp. ¶ 28.

Beverly alleges that Egan retaliated against her when he put Beverly on notice for abusing sick time. Beverly admits that the only result of Egan's notice was that she was required to submit proof of illness whenever she took sick leave for six months. Pltf. 56.1 Resp. at ¶ 79. Beverly did not consider being put on notice for abusing sick time a "big deal" because she was already bringing doctor's notes to work whenever she took sick days. Requiring an employee to substantiate that her absences from work are illness-related does not result in tangible job consequences and therefore is not an actionable adverse employment action. *See, e.g. Longstreet*, 276 F.3d at 384.

Additionally, Egan's notice occurred in November 2006– more than two years after Beverly engaged in protected activity. *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995) (A "substantial time lapse . . . is counter-evidence of any causal connection."); *Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001) (time lapse of one year constitutes counter-evidence of any causal connection between protected activity and retaliation); *accord Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (three months); *see Filipovic v. K&R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999) (four months); *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir. 1998) (five months); *see Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992) (six months); *see Adusumilli v. City of*

*Chicago*, 164 F.3d 353, 363 (7th Cir. 1998) (eight months). Further, Beverly failed to present admissible evidence that co-workers who did not engage in statutorily protected activity did not receive similar notices after taking 12 days off following scheduled days off. Def. 56.1 Resp. ¶ 24; *see* footnote 9.

Beverly asserts that she received undesirable assignments from Bradley; namely, Bradley frequently assigned her to work with Stein and Vance "who were always in trouble." As an initial matter, there was no evidence, other than Beverly's testimony, that Stein and Vance were "always in trouble" and no evidence that Bradley's partner assignments caused Beverly to "get into trouble" because she was working with Stein and Vance. More important, there is no evidence that Bradley's four shift assignments with Vance and Stein significantly altered the conditions of her employment. The evidence reveals that between June 21, 2004 and November 4, 2004 (when Bradley was transferred from the ADF), Beverly worked a total of 60 times and was assigned to work with either Stein or Vance a total of five times. On one of the five occasions in which Beverly was assigned to work with Stein and Vance, Bradley was not working and did not make the assignment. Had Bradley intended to retaliate against Beverly through shift assignments, it is reasonable to expect a higher than 16% frequency of such assignment. Moreover, Beverly did not put forth evidence that similarly situated employees who did not engage in statutorily protected activity were not assigned to work with Stein and Vance.

As for Beverly's claims that Bradley retaliated against her through intimidation when he drove by her home on one occasion, drove past her car on I-80, and stood outside of the gym while she exercised, the evidence fails to support a finding that his conduct was either retaliatory or resulted in an adverse employment decision. First, Beverly does not address Kaupas's arguments on this issue

32

in her Response brief.  Second, Beverly presents no evidence that Bradley's alleged intimidation significantly altered her employment conditions.  Finally, no reasonable juror could conclude based upon the evidence before the Court that these instances were anything other than fortuitous and not casually related to her job, much less retaliatory for her actions.  Bradley's inadvertent passing on the street or visits to the weight room are not supported by any evidence suggesting that these chance encounters were retaliatory in nature.  Rather than create a genuine issue of material fact that Bradley's conduct was retaliatory, the evidence shows that Bradley was following Van Dyke's orders to refrain from coming into contact with Beverly.

Nor did Beverly establish that her coworkers' hostility, including McGrath's, amounted to an adverse employment action.  General hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive.  *Griffin*, 356 F.3d at 828; *citing Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002).  Beverly submitted evidence that the "whole shift" laughed at her and that she was shunned by supervisors and co-workers.  Although the supervisors' and co-workers' comments may have created  an "unpleasant" environment, the evidence does not support a finding that the comments resulted in material harm constituting an adverse employment action.  *See Id.*; *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir.1997) (holding that plaintiff did not suffer a materially adverse employment action when her boss "yelled at her and did not make her feel as if she was part of the work group"); *Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006) (the fact that co-workers may have shunned the employee was not an actionable adverse employment action.)  Beverly's co-workers' comments never "materialized or resulted in any material harm" to Beverly since her contention all along has been that she was performing her job satisfactorily and that she is happy with her transfer to court holding.  *Id.*; *citing*

*Stutler*, 263 F.3d at 704 (noting that supervisor's conduct did not interfere with plaintiff's ability to do her job); *see also Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996) (constant mean, humiliating insults not supported and not actionable). Moreover, there was no allegation that Beverly's dissatisfaction with her co-workers' conduct was not corrected when she transferred to court holding.

Finally, Beverly alleges that Bradley denied her Field Training Officer Assignments in retaliation for filing an official complaint against him. First, the record does not support Beverly's contention that Bradley was responsible for making FTO assignments. Rather, the evidence shows that Martin was the training officer and was responsible for scheduling field training for new recruits, including the FTO assignments. Second, a reasonable juror could not conclude that Martin's failure to schedule Beverly for FTO assignments was an adverse employment decision because it did not significantly alter the conditions of Beverly's employment. Beverly concedes that FTO opportunities were unpredictable and sporadic and Beverly did not tell anyone, including Martin and Van Dyke that she wanted FTO assignments. Beverly does not know how much she earned as a result of FTO assignment prior to March 2004 and cannot say that she lost a significant amount of money as a result of not getting FTO assignments. Although Beverly could request a transfer back to the ADF, Beverly is happy with her court holding assignment and voluntarily chooses to be there despite the fact that she would have FTO opportunities at the ADF. Additionally, Beverly presented no evidence that similarly situated employees who did not engaged in protected activity and had similar absences from work received FTO assignments. *See Patterson*, 281 F.3d at 680.

Even assuming for argument's sake that Beverly put forth evidence to show a prima facie case associated with her lack of FTO assignments, Kaupas put forth non-discriminatory reasons why Beverly was not scheduled for FTO training, namely, Beverly's absences and the fact that she "fell

off of his radar." Beverly concedes that FTOs had to be regularly available in order to receive an FTO assignment and that Martin would not have scheduled anyone for FTO assignments during any month in which the person had significant absences because he would not have been able to rely on the person's availability. Beverly admits that she took 47 days of leave under the FMLA and thirteen days off in August due to sick and bereavement leave. Beverly claims that "it's possible" Bradley told Martin not to schedule her for new recruit training, but Beverly's assertions are not supported by the admissible evidence in the record. Pltf. 56.1 Resp. at ¶ 17; 50; Def. 56.1 Resp. at ¶¶ 32; footnote 5. Accordingly, Beverly has not proffered sufficient evidence to show that the Sheriff's Office's non-discriminatory explanation for Beverly's lack of FTO assignments is pretext for discrimination.

Because there is no genuine issue of genuine issue of material fact associated with Beverly's retaliation claim[11], the Sheriff's Office's Motion for Summary Judgment is granted.

IV.    Conclusion and Order

For the reasons stated, the Kaupas's Motion for Summary Judgment is granted.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   February 29, 2008

_____

[11]   Beverly argues that considering all of these acts together as opposed to in isolation creates a convincing "mosaic" of circumstantial evidence–a method of proof used where plaintiffs rely upon the direct approach. *See Walker v. Board of Regents*, 410 F.3d 387 (7th Cir. 2005). Nevertheless, even considering these acts together does not create a genuine issue of material fact that any of the acts constitute adverse employment decisions nor does considering them together cure Beverly's failure to put forth evidence of similarly situated individuals or to show that Kaupas's non-discriminatory reasons for the actions were pretextual.

35